Filed 9/22/15  P. v. Villalobos CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>SERGIO VILLALOBOS,<br><br>　　　Defendant and Appellant. | B257899<br><br>(Los Angeles County<br>Super. Ct. No. TA130014) |

　　　　APPEAL from a judgment of the Superior Court of Los Angeles County. Eleanor J. Hunter, Judge.  Affirmed with directions.

　　　　Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　　Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Margaret E. Maxwell and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted appellant Sergio Villalobos of four felonies: First degree murder (Pen. Code, § 187, subd. (a), count 1);[1] attempted willful, deliberate and premeditated murder (§§ 664, 187, subd. (a), count 2); possession of a firearm by a felon (§ 29800, subd. (a)(1), count 3); and resisting an executive officer (§ 69, count 4). As to counts 1 and 2, the jury found true the gang and firearm allegations (§§ 186.22, subd. (b)(1)(C), 12022.53, subds. (b)-(e)(1)). At a bifurcated trial, the court found that appellant had suffered two prior serious and violent felony convictions (§§ 667, subd. (d), 1170.12, subd. (b)), plus prior prison terms (§ 667.5, subds. (a), (b)). Appellant was sentenced to a total of 210 years to life in state prison.

Appellant contends that the trial court erred by (1) admitting evidence of a prior arrest, (2) imposing a third-strike sentence on count 3, and (3) imposing two one-year prior prison term enhancements on each count. We remand the case for resentencing; but otherwise affirm the judgment.

## FACTS

**Prosecution Case**

### The Shooting and Get Away

Appellant was a member of the South Los, a Hispanic street gang, with the moniker "Junior." An African-American gang called the Hoovers or Hoover Criminals is a rival of the South Los.

On the night of August 22, 2013, appellant borrowed a white Yukon (the SUV) and drove it into the Hoovers' territory in south Los Angeles. Breanna Hernandez (Breanna) and her boyfriend, Carlos Hernandez (Rowdy), also a South Los gang member, followed appellant in a silver car driven by Breanna.[2] Breanna testified that an unidentified passenger with a bald head was with appellant. Rowdy had told Breanna they were going to follow appellant because appellant "was passing by his enemy's side of town, and that he saw them, and that they were going to go bust a mission." Breanna

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     We use first names or nicknames for ease of reference.

2

understood this to mean that appellant and Rowdy were going to "put in work for their hood," meaning "either go and shoot or something like that."

At approximately 10:00 p.m., several African-Americans were "chilling" with their friends and neighbors outside an apartment building near Colden and Vermont Avenues, including Latasha Lever (Latasha), Macio Curtiz (Macio), and Treavor Robinson (Treavor). Macio saw an SUV pull up abruptly and an arm with a gun reach out of the passenger's side window. Macio later identified the passenger as resembling appellant. Macio heard a shot and turned to run, but the bullet grazed his head. He believed he heard at least two shots. Treavor jumped off the gate and tried to run, but he was hit in the back and suffered a fatal wound. Latasha ducked to the ground until the shots stopped. When she looked up, she saw a white SUV driving away.

Breanna, who had stopped the silver car behind the SUV, followed it, then drove in a different direction, eventually meeting up with it at a shopping center. Appellant and his passenger exited the SUV and got into the silver car. Breanna got out of the silver car, entered the SUV, and drove it to Liquor Land at Imperial and Vermont. Appellant told Breanna to drive the SUV to "throw the cops off" because no females would have been seen inside the SUV when the shooting occurred. On the way to the liquor store, Breanna picked up a young South Los gang member known as Snaps Crissy. Rowdy drove the silver car behind the SUV.

When they arrived at Liquor Land, Breanna and Snaps Crissy exited the SUV and got into the silver car with Rowdy. They went to a gas station across the street, where appellant gave Rowdy a .38 special revolver. Rowdy dropped off appellant, Snaps Crissy, and the bald-headed man. Breanna testified that Rowdy then drove to his home, where he removed the shell casings from the revolver, smashed the casings with a hammer, and discarded them in the trash.

**The Investigation and Arrest**

Later that night, Los Angeles County Sheriff's deputies located the unoccupied SUV in the Liquor Land parking lot. The deputies observed the SUV's owner, Neomi Jackson (Neomi), and a male companion, get into the vehicle. Neomi and the man were

3

detained and placed in the deputies' patrol car. As one of the deputies approached the driver's seat, he heard Neomi say, "I hope they didn't leave anything in the car."

Detective Peter McCoy of the Los Angeles Police Department (LAPD) interviewed Neomi at the station. A recording of the interview was played for the jury. Neomi waived her *Miranda*[3] rights and eventually admitted that she had loaned the SUV to her friend Junior. She identified appellant as Junior both at trial and from a photograph during her interview with the detectives.

On September 11, 2013, a team of LAPD officers went to Imperial Highway to conduct surveillance of appellant. Appellant was spotted walking to a bus stop near a gas station. When the officers pulled up, appellant ran. LAPD Officer Noel Magpoc observed appellant running with a stainless steel semiautomatic handgun. At some point during the chase, appellant turned into a driveway and became cornered. Officer Magpoc drew his pistol and told appellant, "Drop the handgun." Appellant threw the gun he was holding over the fence and assumed a fighting stance with his fists raised in front of his chest. Appellant was eventually tackled by several officers, ignoring Officer Magpoc's commands to "Stop resisting!," and was arrested. The gun appellant threw over the fence was then recovered.

**Appellant's Interview**

Appellant was interviewed by LAPD Detective McCoy on the day of his arrest. A recording of the interview was played for the jury. Appellant waived his *Miranda* rights. He stated that he used to be a member of the South Los gang with the moniker, "Little Spanky," and denied being called anything else. He denied being in a white SUV or borrowing a car. He also denied being involved in the shooting, stating that at the time of the shooting he was either sleeping at the home of his "baby's mom" in Silver Lake or was at a Dodgers game.[4] He told the detective he had heard about who had done the shooting and could "really help" the detective, even get him a promotion. After the

---

[3]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[4]     The parties stipulated that the Dodgers were not in town on August 22, 2013, and that appellant had a prior felony conviction.

4

interview, while being taken down to the booking area, appellant told Detective McCoy that he knew where the gun was, and identified it as a "38 special."

**Cell Phone Records**

Appellant's cell phone records showed that on August 21, 2013, the day before the shooting, appellant received text messages that a "homie got hit last night" by the "Snoochies" and was in critical condition. Snoochies is a derogatory term referring to members of the Hoovers gang. Appellant's phone records also showed that two minutes after the shooting, appellant had multiple calls with the same cell phone that had sent the text messages. After analyzing appellant's cell phone data and cell tower locations, an LAPD detective opined that on August 22, 2013, at 8:16 p.m. and 10:12 p.m., appellant's cell phone was located four streets away from the site of the shooting.

**Forensic Evidence**

Three fingerprints obtained from the SUV's front passenger's side window matched appellant's fingerprints. A criminalist with the LAPD, who examined the firearm and the magazine recovered in this case, as well as the projectile found in Traevor's body, opined that the projectile from the victim's body was not fired from the gun recovered at the time of appellant's arrest.

**Defense Case**

Mitchell Eisen, a forensic psychologist, testified that a traumatic event acts as an "enormous distraction" to an eyewitness, affecting his or her ability to pay attention to the details of the event and to store them in long-term memory. The passage of time also affects a person's ability to recall an event and the best recollection occurs shortly after the event. A six-pack photographic lineup may be suggestive when it includes a photograph of an individual that matches the physical description given by the witness prior to the lineup.

Appellant testified on his own behalf. Some people called him "Junior" because his father had the same name. Appellant became a member of the South Los gang when he was approximately 13 or 14 years old, but he had not been an active gang member since 2010.

5

In 2003, appellant committed a car theft and was sent to prison. In 2008, appellant was convicted of burglary and was placed on three years of probation. In 2009, appellant was convicted of robbery and served two years in state prison. Appellant admitted that he committed these crimes as a gang member but denied using a gun during their commission.

A month or two before his arrest, appellant was at a liquor store with another former South Los gang member. A car stopped in front of the liquor store and three African-American men came out shouting "Fuck South Los," and "This is West Side Hoover." Appellant and his friend became involved in a physical altercation with the three men until the police arrived and arrested appellant. The police booked appellant for carjacking but appellant denied taking anyone's vehicle after the altercation. The carjacking case was eventually dismissed by the district attorney.

On August 22, 2013, appellant was on his way to a gas station to buy cigarettes when he saw Neomi. He asked her for a ride to a house where he could buy marijuana. She gave appellant her keys and told him to take her SUV. Appellant drove the SUV to the "weed house." After purchasing some marijuana, appellant saw some South Los gang members, including Rowdy, "Stomper," and Snaps. Stomper told appellant he needed to use the SUV. When appellant told Stomper that he had to return the SUV to Neomi, Stomper punched appellant. Stomper pulled out a black gun and told appellant that he was going to use the car whether he liked it or not and demanded the keys. Stomper, Rowdy, and Snaps entered the car and drove off while appellant remained behind. Appellant's cell phone was still in the SUV when they left.

Appellant walked back to the gas station but could not find Neomi, so he went to his girlfriend's house across the street. Later that night, Rowdy showed up at appellant's girlfriend's house with Breanna and returned the SUV and appellant's cell phone. Rowdy told appellant, "'Whatever happened earlier, you don't know nothing about . . . .'" A few days later, Rowdy tried to sell appellant a gun. This is why appellant told Detective McCoy that he probably could find the gun used in the shooting.

6

On September 11, 2013, appellant had an appointment to meet his parole agent at the gas station. He denied having a gun with him. As he was waiting, several men in civilian clothes approached him with guns. Appellant took off running. After reaching a dead end, appellant saw that he was being chased by police officers so he gave himself up. He denied throwing a gun or assuming a fighting stance before his arrest.

## DISCUSSION

### I. Admission of Carjacking Evidence

Appellant contends that the trial court committed prejudicial error and violated his constitutional right to a fair trial by admitting evidence of his arrest for carjacking.

#### A. *Background*

After appellant indicated that he would be testifying, the prosecutor informed the trial court that he wanted to ask appellant about a carjacking incident involving Hoover gang members that occurred 10 days before the shooting. Defense counsel objected, noting that appellant had only been arrested and not convicted. The prosecutor indicated that he had subpoenaed the officers, if their testimony was needed, and explained: "Essentially—I would be . . . asking, 'Did this event happen?' And go into details. And it provides, as previously discussed, additional motive related to why, ten days later, he is in a car, driving into Hoover gang territory." The trial court found the evidence was admissible to prove appellant's motive.

During his direct testimony, appellant testified that a month or so before the shooting he was involved in a physical altercation with Hoover gang members. Appellant volunteered that he was arrested. He explained that he and a friend were about to enter a liquor store when three African-American men jumped out of a car, insulted his gang, and said they were from the Westside Hoover gang. Appellant stated that one of the men had a pocketknife and appellant had to stop the man from trying to stab his friend. Appellant explained that he was arrested and booked on carjacking, but the district attorney dismissed the charge and he was released from jail.

On cross-examination, when the prosecutor began asking about the incident, appellant said he remembered it and that he "got arrested." He admitted that it occurred

7

10 days before the shooting and said, "I just remember them saying that I was going to jail for carjacking." When the prosecutor asked, "Because you said you've been a gang member ten years, and I just want to know, in your—what you know of [the] South Los gang, if South Los gang members get jumped, aren't they called upon to retaliate?" Appellant responded, "I would agree, yes."

### B. Relevant Law

Under Evidence Code section 1101, subdivision (a), evidence of specific instances of a defendant's conduct is inadmissible to prove the defendant's conduct on a specified occasion. However, under Evidence Code section 1101, subdivision (b), evidence that a defendant "committed a crime, civil wrong, or other act" is admissible to prove some fact other than criminal disposition, for example, to prove motive. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 400 ["'Section 1101 does not prohibit the admission of evidence of misconduct when it is offered as evidence of some other fact in issue, such as motive, common scheme or plan, preparation, intent, knowledge, identity, or absence of mistake or accident'"].)

"There is an additional requirement for the admissibility of evidence of uncharged crimes: The probative value of the uncharged offense evidence must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury." (*People v. Kipp* (1998) 18 Cal.4th 349, 371.) We review a trial court's decision to admit evidence of uncharged crimes for abuse of discretion. (*Ibid.*)

### C. Analysis

Appellant essentially argues that the trial court abused its discretion in admitting the evidence of the prior physical altercation with rival gang members because the conduct only resulted in an arrest and not a conviction. But as described above, this is not the law. Evidence of a prior act is admissible to prove motive, so long as it has substantial probative value that is not outweighed by undue influence.

Here, the evidence of a physical altercation between appellant and three rival gang members just days before the shooting was substantially probative because it

demonstrated the ongoing rivalry between the two gangs and appellant's gang motive to commit the drive-by shooting in the rival gang's territory. (See *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1212 [no abuse of discretion where evidence of prior gang shooting admitted to show intent and motive for current shooting].)

We disagree with appellant that the evidence was unduly prejudicial. The evidence was presented through appellant's testimony without the need for additional witnesses, and the prosecutor's inquiry into the subject matter was relatively brief. Appellant first discussed the confrontation during his direct testimony and therefore had a full opportunity to present his own version of the facts, deny the carjacking allegation, and discuss the dismissal of the carjacking charge by the district attorney. Moreover, the evidence of *arrest* was volunteered by appellant during both the direct and cross-examination; it was not elicited by the prosecutor. Defense counsel did not object or move to strike this volunteered testimony. Finally, the prior gang incident involved different crimes—physical altercation and carjacking—than the crimes appellant was charged with here (murder and attempted murder through a drive-by shooting).

In any event, any error in admitting the evidence would have been harmless under both the federal and state standards (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836).

Appellant admitted on his direct examination that he had three adult felony convictions for car theft, burglary, and robbery. It is not likely that a jury would weigh more heavily a mere arrest for carjacking over three actual convictions, especially when the jury heard that the district attorney dropped the charge of carjacking. (See *People v. Medina* (1995) 11 Cal.4th 694, 769 [admission of evidence of defendant's arrests rather than his convictions or commission of actual violent crimes found to be "clearly harmless" in light of defendant's extensive criminal record].)

Moreover, the evidence of appellant's guilt was overwhelming. Breanna described in detail the activities that took place before and after the shooting, including how appellant told her to drive the SUV to throw off the police and gave the .38-caliber handgun to Rowdy. Neomi also identified appellant as the person who had borrowed her

9

SUV. And the cell phone records placed appellant at or near the location of the shooting at the time the victim was shot.

In light of our conclusion that any error would have been harmless, we find no merit to appellant's claim of a constitutional violation.

## II. Remand for Resentencing on Count 3

Appellant contends, and the People agree, that the case must be remanded for resentencing on count 3—possesion of a firearm by a felon.

Here, the trial court imposed a third strike sentence of 25 years to life, exclusive of enhancements, for appellant's conviction on count 3, based on the court's finding that appellant was actually armed and therefore had possession of a firearm. This was error.

Under the current version of the "Three Strikes" law, an indeterminate life sentence as a third strike offender is reserved for cases where the current crime is a serious or violent felony or the prosecution has pled and proved an enumerated disqualifying factor. In all other instances, the recidivist is sentenced as a second strike offender. (*People v. Yearwood* (2013) 213 Cal.App.4th 161, 167; §§ 667, 1170.12.)

The offense of felon in possession of a firearm is not a serious or violent felony. (§§ 667.5, subd. (c); 1192.7, subd. (c); *People v. Brimmer* (2014) 230 Cal.App.4th 782, 792 (*Brimmer*).) However, "[u]sing a firearm or being armed with a firearm during the commission of a current offense is a disqualifying factor listed in section 667, subdivision (e)(2)(C)(iii), and section 1170.12, subdivision (c)(2)(C)(iii)" that would subject a defendant to a third strike sentence. (*Brimmer, supra*, at p. 792.) Because a disqualifying factor increases the penalty beyond the statutory maximum, it must be tried to a jury and proven beyond a reasonable doubt. (See *Descamps v. United States* (2013) __ U.S. __ [133 S.Ct. 2276, 2288, 186 L.Ed.2d 438].)

A defendant can be convicted of being a felon in possession of a firearm even if he was not actually armed, but only had constructive possession. (§ 29800, subd. (a); *Brimmer, supra*, 230 Cal.App.4th at p. 795.) "'To establish constructive possession, the prosecution must prove a defendant knowingly exercised a right to control the prohibited item, either directly or through another person.' [Citation.]" (*Brimmer*, at p. 795.) Thus,

10

"while the act of being armed with a firearm—that is, having ready access to a firearm . . . necessarily requires possession of the firearm, possession of a firearm does not necessarily require that the possessor be armed with it." (*Ibid*.)

The People concede that the prosecutor did not plead and prove to the jury that appellant was actually armed with a firearm. Absent such a finding by the jury, the trial court erred in sentencing appellant on count 3 as a third striker. Accordingly, the case must be remanded to the trial court to determine the appropriate second strike sentence for count 3.

## III. Prior Prison Term Enhancements

The trial court found that appellant had served two prior prison terms for purposes of sentence enhancement under section 667.5, subdivision (b). For each count of conviction, the trial court imposed two one-year sentence enhancements. Appellant contends this was error because the information was never amended to allege such enhancements.

### A. Background

The information in this case alleged that appellant suffered two prior serious and violent felony convictions (§§ 667, subd. (d), 1170.12, subd. (b)), one prior conviction for which a prison term was served (§ 667.5, subd. (a)), and four prior felony convictions (§ 1203, subd. (e)(4)).

In the morning session of the first day of trial, the prosecutor informed the trial court that he intended to amend the information to add prior prison term allegations to counts 3 and 4. The court noted that it could not have appellant "plead open if [the prosecutor was] still kind of messing around with wanting to amend your 'information,'" and instructed the prosecutor not to mention counts 3 and 4 during his opening statement.

Later in the afternoon session, the trial court asked about the amended information. The prosecutor said that his secretary was working on correcting the information and that a clerk "was going to bring it down." The prosecutor said that the amendment would include "[t]wo two-year priors to counts 3 and 4," and that the "[section] 12022.53 allegations" were being corrected to be alleged pursuant to section

11

12022.53, subdivision (e)(1). The court asked the prosecutor whether "it would be two one-year priors," and the prosecutor said, "Yes, your Honor." Defense counsel objected, stating that he did not know "if that can be amended at this point." While later discussing count 3 with appellant, the court advised him, "So it looks like the People are going to amend their 'information.' That brings it to eight years [on count 3], and that reflects having two one-year priors . . . . And do you wish to go ahead and take your counsel's advice and plead open to that or do you want to . . . keep with your not guilty plea as to counts 3 and 4?" Appellant responded, "Not guilty."

Before the jury returned its verdicts, appellant waived his right to a jury trial on the "priors." After appellant was convicted, the trial court held a "priors trial." The court found true the allegations that appellant had four prior convictions or juvenile adjudications: (1) a felony conviction for robbery in case No. SA070155; (2) a felony conviction for taking a vehicle without the owner's consent in case No. SA048439; (3) a felony conviction for burglary in case No. TA103054, and (4) a juvenile adjudication for robbery in case No. JJ08698.

The trial court then asked the prosecutor about the one-year prior prison term allegations. The prosecutor responded, "The People orally amended to add the one-year priors. That's in the discussion when we had discussion on count 3, and the People added the two one-year priors, if the court recalls." The court responded, "I don't recall that, and you didn't take the time to file an 'amended information.'" The prosecutor then stated: "I had the 'amended information' made; however, we had already done it orally, so I didn't further that. So those go to one-year priors, your Honor." The court responded: "Okay. The court's going to find the People have satisfied its burden of proving beyond a reasonable doubt that the defendant did suffer those prior convictions."

### B. Analysis

It appears that the trial court and the parties believed that the information had been orally amended. Indeed, defense counsel never objected at the priors trial or at sentencing that the information had not been amended.

12

In any event, appellant's primary challenge to the prior prison term enhancements—that he had no notice that he would be subject to those enhancements—fails under the circumstances here. The record shows that appellant was aware from the first day of trial that the prosecutor intended to add the sentence enhancements. There was much discussion about appellant's maximum sentencing exposure based on the intended amendments. And the trial court asked appellant how he would plead to counts 3 and 4 with the addition of the prior prison term enhancements. Appellant responded, "Not guilty," which was against the advice of his counsel. Additionally, the two prior convictions that qualified as the prior prison term enhancements under section 667.5, subdivision (b) were among the four prior conviction allegations included in the original information under section 1203, subdivision (e)(4). Thus, there was no surprise in adding an allegation under another statutory provision that could have prevented appellant from preparing and presenting a defense at the priors trial.

Furthermore, the parties are correct that one of the two prior prison term enhancements under section 667.5, subdivision (b) must be stricken. For each count of conviction, the trial court imposed a three-year sentence enhancement and two one-year enhancements under section 667.5, subdivisions (a) and (b). This was based upon the trial court's apparent finding that appellant had served three prior prison or jail terms that made him subject to the enhancement of his sentence under section 667.5. The evidence, however, shows that appellant served only two terms that qualified him for such enhancement.

As noted above, the evidence demonstrated that appellant had been convicted as an adult of three felonies: robbery in case No. SA070155, taking a vehicle without the owner's consent in case No. SA048439, and burglary in case No. TA103054. He was sentenced to state prison for only two of these felonies—the robbery and taking of a vehicle. Imposition of sentence for the burglary conviction in case No. TA103054 was suspended and appellant was required to serve 27 days in the county jail as a condition of probation. He was subsequently charged with violating the conditions of that probation, but probation was reinstated and terminated when appellant pled guilty to the robbery

13

charge in case No. SA070155. Therefore, one of the one-year enhancements imposed for each count must be stricken.

## IV. New Abstract of Judgment

The parties are correct that the abstract of judgment incorrectly reflects the number of prior prison term enhancements imposed by the trial court. Here, the court imposed four three-year enhancements under section 667.5, subdivision (a) (one for each of four counts), and eight one-year enhancements under section 667.5, subdivision (b) (two for each of four counts). However, the abstract of judgment erroneously states that the court imposed five three-year enhancements under section 667.5, subdivision (a), and 10 one-year enhancements under section 667.5, subdivision (b). Because remand for resentencing is necessary, a new abstract of judgment must be prepared to reflect the correct sentences.

**DISPOSITION**

The case is remanded for (1) resentencing on count 3; (2) the striking of one of the two one-year prior prison term enhancements under section 667.5, subdivision (b), on each count; and (3) to correctly reflect the prior prison term enhancements imposed. In all other respects, the judgment is affirmed. The trial court is to prepare an amended abstract of judgment and to forward a copy to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
                ASHMANN-GERST

We concur:


_____, P. J.
      BOREN


_____, J.
      HOFFSTADT

14
